The reason I rushed up here is that I have two housekeeping matters and I'm hoping it doesn't count against my time. You want a housekeeping exemption to the time clock? How long are the housekeeping matters? I promise you that they are ten seconds. All right. Hold the clock for ten seconds. Thank you. The first thing is I wanted the court to know that counsel and I have decided to – there's a motion to strike here that's part of the record. And we've decided to rest on our papers on that particular right. Well, you didn't need to say that, but – I didn't. Well, if you don't redress it, we assume you're resting on your papers. Oh, okay. Just so you know. I'm sorry. The second is that I have a handout. Usually one would do a poster, but most of the evidence here is still – Okay. Go ahead and hand it to the clerk and she'll pass it along. Okay. Thank you. Does counsel have this? Yes, counsel has. All right. I just wanted to make sure you had it. Okay. And then I have a third one. I'm sorry. Oh, here they are. Thank you. Thanks very much. All right. Is that all the housekeeping? That's it, Your Honor. All right. Why don't we go ahead and start the clock then. Thank you. May it please the court, my name is Edward Dangle. I am representing independent grocers, single and double supermarkets in the greater Boston area. As the court knows, we, while a companion case to the Midwest case, we didn't get a trial in this case and we didn't get certification in this case. In fact, the plaintiffs that I represent joined the case after it had begun and were not present when class certification matters were handled in the past. In per se antitrust cases like this, the plaintiffs commonly use benchmark methodologies employing regression analysis to prove a causal nexus between the conspiracy and the harm from it. In this particular case, the expert used a benchmark method called a contemporary benchmark. In this case, a large grocery chain in the greater Boston and New England area called Stop and Shop, which competes for the same customers, uses the same supplier, has mostly the same products, and is similar in all but a few respects that are material here. The benchmark methodology, the contemporary benchmark methodology, is one that's been approved for a long time since Bigelow versus RKO Pictures. It was in the latest volume of Econometrics, sort of the Bible for this sort of thing. It was an approved and, in fact, preferred methodology. And we submit that the expert did a very good job of separating out the factors that might have confounded his analysis in the case. The difference between Stop and Shop and the individual grocery stores really boils down to a few important ones. Of course, Stop and Shop is much larger. And, of course, it buys a lot more. And its product mix may be a little different. So the usual method of analysis, which is what the expert used here, is regression analysis, equations that are tested statistically to determine whether those factors confound the study. He found to a high degree of statistical significance that they did not confound his study, in part because he didn't assume that the Stop and Shop and the Independence would have the same pricing. He assumed, of course, that Stop and Shop would have a better pricing. So what he studied was the pathway of the pricing after the antitrust violation occurred. In other words, after SuperValue abandoned New England, the question was, was there an effect on the delivery pricing of CNS, which was the wholesale grocer left behind, to our clients that looked different, that had a different pathway than Stop and Shop. And he found that they did, that they diverged quite dramatically during the antitrust period, and he reported that. The court did not judge this matter with the usual Daubert factors. There was no question that the expert was well qualified, that he was using a usual method, that he did his regression analysis well, and that his calculations, in terms of numbers, were correct. Instead, the issue that was raised boils down to comparability. SuperValue doubted that Stop and Shop was sufficiently comparable to the individual plaintiffs. And what we want to say to the court, particularly, is that the issue of comparability has been found around the United States to be an issue for the jury. To begin with, questions of antitrust causation and harm are complex, usually involve complex factual questions. And they were particularly, the record is particularly fact-laden in this particular instance. It wasn't one of the problems, and maybe this is what you mean by comparability, but that there wasn't a way to show that the same pattern, that Stop and Shop, a big retailer and the smaller ones, would be acting in the same way with competition, that they didn't have part of the benchmark is, well, how were they, what was the comparison between those two, assuming a competitive market? Isn't that part of what's missing here, part of like a base of his opinion? It isn't missing here in this particular case for this reason. The Stop and Shop has a particular factor that makes it separate from antitrust pricing, and that is its ability to self-supply. Its own expert had been a consultant for Stop and Shop, and he testified that the ability to self-supply, that Stop and Shop's ability to self-supply meant it wasn't subject to antitrust pricing. So you didn't have to study the before period. You had a factor that separated. Wouldn't you have to see before, though, what the relationship was between, even assuming it is impervious to this sort of anti-competitive nature, that it can stand on its own? Don't you still have to look at how it was all working before, even assuming that? Well, respectfully, Your Honor, the expert says you don't, and I'm not an expert, but let me try to make it make sense to you. They're competing in the same area. Super value leaves. It's 20 percent, again, hypothetically, it's 20 percent of the market. It means CNS was 70 to 75 percent of the market. Stop and Shop is buying from CNS. We're buying from CNS. But Stop and Shop knows in every negotiation, if they don't give them the price they want, they can self-supply. As the defense's own expert said, and Dr. Levy says, that is sufficient evidence of non-antitrust pricing. You don't have to do a before and after study. But let me jump to that. So there was limited data concerning CNS's pre-conspiracy behavior with regard to Stop and Shop and the independents. Both experts studied it. There were 11 customers out of the 50. Our expert concluded that what was happening before, in the year before the antitrust conspiracy, was that the prices were sort of moving together. In other words, that the independents were getting a little better price in terms of the pathway in relation to Stop and Shop than they had before. But after the conspiracy, it diverged dramatically. And as I understand, your expert did not rely on that. That was just data that supported his model. It validated his approach. It validated his model. The judge accepted that 11 was sufficient for the defendant's study and said that 11 wasn't sufficient for ours and refused to credit it. We say that both experts were relying on the same 11. We say that's a fact issue for the jury to decide. That's just one of many to decide. In addition, I'm getting down to close to where I am going to stop. And so, in addition, let me show you this chart that I brought along and tell you why I brought it. There's a dispute, which I'm sure my brother will bring up, concerning whether or not a pricing thing that happened in 2005 with regard to Stop and Shop made a huge difference, that it invalidates our study. And I wanted to show you on the second page is what the defense expert presented. He said that frozen, that's this page here, that frozen prices fell off a cliff in 2005 and never recovered. Our expert provided a chart that shows not that, but a gradual decline. What the difference was, was that the expert for the defendants left out 50% of what goes into a price. The third page shows you that he admits he left out freight and rebates. He also left out other adjustment factors. The reason why I show this to you is it shows you that both experts had different approaches to figuring out the pricing. Both are entitled to be heard by the jury. Thank you. I'm reserving, I guess, four and a half minutes. All right, very well. Mr. Szafranski, we'll hear from you. Thank you, good morning, your honors. May it please the court, my name is Stephen Szafranski, counsel for Appellee Supervalue. Your honors, this appeal comes down to whether Judge Montgomery, who has been managing this case for a decade, abused her discretion in excluding plaintiff's economist as unreliable and speculative. She didn't. It's important that we start with a clear idea of what the plaintiff's theory of injury is in this case. The complaint alleges that CNS's purchase of Supervalue's New England business and the AEA eliminated competition between them and led to higher prices. But the plaintiff's own upcharges in this case declined by nearly 40% during the alleged impact period. So the plaintiff's whole theory of injury here is that they would have declined even more if Supervalue had stayed in New England. And he tried to support this with the opinion of Dr. Levy, who took a single large customer, Stop and Shop, which was 700 times larger than Village Market and was in fact partially self-distributing, and whose upcharges fell by 50% during the impact period, and he decided that Stop and Shop's price decline should be the benchmark for what every other retailer in the Midwest's, I'm sorry, in New England's prices would have done if Supervalue had stayed in the market. And the district court properly excluded that opinion because Dr. Levy never supported his speculative assumption that independence prices moved in tandem with Stop and Shop's in any time period or any geography that was unaffected by the alleged asset exchange, or the alleged violation. And he dismissed undisputed evidence that Stop and Shop's prices declined during this period for reasons that were unique to Stop and Shop. Her careful 25-page opinion on these issues is a classic exercise of the district court's gatekeeping authority under Daubert. And because she didn't abuse her discretion in that regard, summary judgment necessarily followed because there was no evidence of antitrust injury, and the class certification issue was moot. I need to spend a little time talking about Dr. Levy's theory in this case, and it went something like this. As Mr. Dangle alluded to, Dr. Levy assumed, well, because Stop and Shop is a $7 billion self-distributing chain, it could resist or avoid any attempt by CNS to charge super competitive prices. And he then leapt to the next conclusion, which was, and since Stop and Shop had stores in the same region as Village Market, then anything that caused Stop and Shop's prices to decline during this 2003 to 2008 time period necessarily would have caused Village Market's prices to decline at the same rate. And that was it. Judge Montgomery carefully looked at it, and she found that it really came down to a speculative leap of faith. And this court's precedents are legion, that expert opinions based on speculative assumptions that aren't verified, that don't separate conspiratorial from non-conspiratorial conduct, are inadmissible. In fact, it would have been reversible error for her to admit this opinion. And let's talk first about how Dr. Levy purported to verify his assumption. He looked at 11 retailers out of 50, which did not include Village Market, and he looked at their pre-AEA prices for the eight months preceding the asset exchange, and he found, consistent with our expert, that there was no significant statistically positive correlation between their prices. Our expert pointed out in response to Dr. Levy that Dr. Levy's opening report just had an assumption that the independence prices would follow Stop and Shop's, and our expert dropped a footnote saying, and by the way, even the 11 retailers that were supplied by CNS before the asset exchange, their prices had both positive correlations and negative correlations with Stop and Shop's, which doesn't show anything. Dr. Levy came back and said, well, as a matter of fact, there's so few, there's so little data that you can't draw any statistically significant conclusions about correlation because it could be either positive or negative for any one of them. Mr. Dangle alluded to Dr. Levy's opinion that, well, before the asset exchange, they were maybe increasing, most of them were maybe getting slightly better prices than Stop and Shop, but in his own report at page 262 of the plaintiff's appendix, he said that his results for these 11 individuals were not statistically significant. That means they can't- In your view, in your analysis or critique of Dr. Levy's report, did he need pre-AEA data in order to establish what you're saying he assumed in his report? He needed to do-well, he could have done it in a number of ways. He needed to find some way of supporting his assumption that in some time period that was not affected by the alleged antitrust violation that there is some basis to believe that if Stop and Shop's prices go up, the independents go up. If they go down, the independents go down. So he could have looked at pre-AEA data, which he did not adequately do. He could have looked at data from markets that were unaffected by the alleged antitrust violation in this case. He didn't do that. He could have looked at data after the alleged conspiracy period ended in 2008. There was a whole year of CNS data from 2009, and by his own admission, he didn't look at that data either. Instead, on appeal, counsel argues that, well, Village Market negotiated a very significant price decline in 2006 and 2007, and that should count as the validation that competition, in fact, would have caused its prices to go down more. The problem with that theory is that it is not tied to any alleged change in the structure of the market. There's no allegation that super value came back into the market in 2006 and 2007. There's no allegation that any new competitor entered the market. Instead, it was based on competition, according to CNS documents, from Associated Grocers New England, somebody who had been in the market competing for Village Market's business the whole time. In fact, Village Market's got a different price reduction from CNS in 2004, right after the asset exchange, and shortly after Village Market told CNS that it was going to leave CNS and go be supplied by Associated Grocers New England. So what are the non-conspiratorial factors that Dr. Levy did not or basically disregarded? First off, he disregarded the fact that ordinary inflation and the underlying cost of the product would make Stop-and-Shop's fees look smaller as a percentage of the cost of the product over time. In 2002, Stop-and-Shop negotiated a seven-year requirements contract, which meant that it had to purchase minimum number of cases of dry grocery from CNS and all of its requirements for frozen over the course of seven years. And its upcharges, unlike Village Market's, were not set as a percentage of the cost of goods. They were flat per case fees. So over time, a flat per case fee over the life of this contract appears smaller and smaller as a percentage of the cost of goods. In this case, a $15 case of product in 2002, when the contract was signed, would cost $18.24 using the standard CPI adjustment by the end of that period. That would have resulted in an 18% reduction in what it appeared to be Stop-and-Shop's prices over the time period. And Dr. Levy counts that as damages, as damages to Village Market. And he does that, and the argument was, well, Stop-and-Shop had this unique ability to bargain for this type of provision, and Village Market didn't. It had to negotiate for a standard percentage upcharge. The problem with that theory is that Stop-and-Shop negotiated this contract in 2002, which was a full year before the Asset Exchange Agreement, and Village Market, before the Asset Exchange Agreement, was paying a percentage upcharge. So this difference that they're pointing to is something that has absolutely nothing to do with the alleged violation in this case. The second major factor that was not taken into account by Dr. Levy's analysis was the reduction in the frozen foods upcharges that Stop-and-Shop negotiated with CNS in 2005. In 2005, CNS, shortly after having merged with a major DC chain called Giant of Landover, brought all of Giant of Landover's business for 200 stores in the DC area in frozen to CNS under a new addendum to the existing 2002 Supply Agreement. And in exchange for that, according to Mark Gross, who was the person who negotiated this contract on behalf of CNS, in exchange for that, CNS agreed to reduce the upcharges for frozen foods for Stop-and-Shop's New England stores. So this was a reduction in upcharges in exchange for business brought in outside of the alleged area of impact. And it wasn't done all at once. It was one large reduction in 2005 and then sequential increasing reductions in frozen food upcharges in 2006, 2007, all the way to 2009. Are these factors that Dr. Levy then addressed in his rebuttal report? He addressed them in his rebuttal report, but all he said was, I just don't believe that CNS would have reduced upcharges in New England in exchange for the Stop-and-Shop Giant of Landover business in DC. So is that different than taking it into account in your own analysis? I guess what I'm trying to get at is where is this line between us arguing about or discussing the factors that go into whether this is a good benchmark and whether or not that there's been proven to be anti-competitive harm, and where is the line drawn where we say this doesn't even have sufficient validity to go to a jury? Sure. Let me unpack that. I think there's two parts to that question. One, on whether Dr. Levy was in a position to dispute the undisputed evidence of why CNS got an upcharge reduction in New England. I think the Supreme Court said it best in Brook Group versus Brown and Williamson, which is an expert can interpret market facts, but an expert's opinion cannot substitute for market facts, and that's what Dr. Levy was trying to do. But on whether this goes to the weight or admissibility, I think one case that would be instructive is the Craftsman Limousine case, which dealt with another benchmarking exercise. That was an antitrust case involving lost profits damages, and the expert in that case said, well, gee, before the alleged group boycott, the plaintiff's growth was experiencing a 60% annual growth rate in its limousine business. So I'm going to assume that in a competitive market, during the period of the conspiracy, that that growth rate would have continued to increase by 60%. But the expert didn't take any analysis, didn't do anything to try to disaggregate the effects of other factors, other factors that may have caused its growth rate to be different. And that is exactly the problem we have here. And in that case, the district court admitted the opinion testimony, but this court held that it was reversible error to admit that testimony. The same type of holding was reached in the Concord Boat case, where a 50% benchmark was used, in which the expert opined that, well, any time the defendant's market share went over 50%, I think that's the result of unlawful competition, and I'm going to calculate damages based on that. But the expert had not accounted for other factors that could have caused its market share to go above 50%, including the recall of a competitor's product, a merger of two other competitors. And that's the problem we have here. What we have is basically an assumption that stop-and-shops prices would have declined by 50% and that everyone else's prices would have declined by that much as well. And when asked, well, what caused this reduction in stop-and-shops prices, Dr. Levy said, I don't know. Have you tried to find out? No, I have not. Well, have you studied whether there was some industry-wide factor that would have caused every retailer's prices to fall by 50%? He said, no, I didn't do a study for that. Instead, all he did was when other reasons were brought forth, both in our expert reports and in our Daubert motion, he submitted declarations and additional opinions trying to account for those factors, but he never really did so. So even right now, Mr. Dangle can't tell you what caused this decline. We've submitted undisputed evidence that the decline was caused by factors that are unrelated to the conspiracy. Because of that and because there was never any statistically valid showing. Well, would yours be that you have shown factors that could have caused the decline? I think we showed factors that did cause the decline. Keep in mind, as the responding party, we don't have the burden of tying it out. All we have to do is point out that Dr. Levy has not taken into account significant factors that caused a decline that he is counting as damages. In Concord Boat and in Craftsman Limousine, this court didn't go so far as to say, well, we find no damages. They found that the district court should have excluded it, the opinion, because the expert hadn't done his work to take into account the other factors. So if there are no other questions, I'll rest. Thank you. Please, the court. To answer the court's question, yes, he did use AEA data. He used it well. He did not say that the data couldn't create statistical significance. What he said is when the other expert did his study, he didn't do any statistical significance testing so that the other expert's study had no meaning. In terms of drawing the line here between what goes to a jury and what doesn't, I have two thoughts. One is a case I read yesterday called Trevena that was decided by the circuit last year, in which the standard was whether or not, as between conflicting narratives, conflicting stories of what happened, if the plaintiff's story is not completely out of line, I'm very much paraphrasing the case, then, of course, it goes to the jury. You don't accept the defendant's story, which is exactly what the judge did here. You determine whether the plaintiff's story holds together. In this case, there's no question when one reads the report, the rebuttal report that dealt with that exact factor brilliantly, I feel, and reads the declaration, that he more than analyzed every point, that the expert reports are more than good. And what happened was the judge failed to realize, appears to have failed to realize the importance of the regression analysis he did and what that means, but also, importantly, failed to recognize not only the logic, it's not an assumption that self-supply creates a different situation than the situation that the plaintiffs have where they're relying on a full line supplier. The defense expert testified to it. It's paragraph 104 at the pages plaintiffs 191 and 92 of the record. And here's how it happened. In the Midwest case, they used the same expert. The plaintiffs included chains in the images. And the expert said you can't say that a chain is subject, that self-supplies is subject to antitrust pricing. It isn't. It wasn't an assumption. It's established fact. This expert negotiated four stop and shop two years before the antitrust conspiracy and said that the power of self-supply drove the prices. You didn't need to do a before and after study because you had a benchmark like the situation in a before or after study. You had a benchmark that wasn't subject to antitrust pricing. For the judge to call that an assumption and refuse to credit it when both experts said it was so, it seems to me is, I'm not going to say on the part of the court, but it's like when I answer your question, I'm not an expert. We have to rely on experts. Does the opinion hold together? Here it completely holds together. There's a case I hesitate to mention. There's a case called Johnson v. Meade, which is a fundamental case that needs to be followed in this district. Cases like this go to trial. So I can go on. The frozen story, respectfully, pages 39 to 41 of the rebuttal report, shows that frozen wasn't the whole story. The graphs that I showed you showed you a gradual path, even in frozen. When you look at the charts in the report, it's very clear what's happening. The plaintiff's prices are staying the same or going up, and the defendants are going down. It was a down market. Stop and shop got a 50% reduction. It doesn't have to be perfect in antitrust to hold muster. That's all. This was clear enough. I've run out of time. I wanted to mention the class certification. And I could just, if I may, finish with this sentence. All of these questions that have been talked about here and everything in the briefs is a common question. It's common to all 50 plaintiffs. There's no doubt we've met predominance. And thank you. I'm sorry. Thank you very much. Thank you very well.